# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

BARADO L. MURRAY,           ]
                            ]
   Plaintiff(s),        ]
                            ]
vs.                         ]    CV-00-N-3751-W
                            ]
TED SEXTON, et al.,         ]
                            ]
   Defendant(s).        ]



## Memorandum of Opinion

### I. Introduction

The court has for consideration the motion for summary judgment of defendants Sheriff Ted Sexton, Chief Jailer James Taggart, and deputies David Andre Simpson and Jeffrey Holloway. (Doc. # 36). The defendants contend that summary judgment is due in their favor on the claims alleged against them by plaintiff Barado L. Murray. Several arguments are proffered in support of this position – most of which invoke the doctrines qualified and/or discretionary function immunity as shields against suit. The issues have been brief by the parties and are ripe for decision. Upon due consideration, the court finds the motion of defendants due to be granted in part and denied in part.

### II. Background

On or about January 1, 1999, Mr. Murray was arrested by an Alabama State Trooper in Tuscaloosa, Alabama, and charged with driving under the influence. (Doc. # 1, ¶ 10). Mr. Murray was subsequently transported to the Tuscaloosa County Jail, where the arresting

officer subjected him to a breathalyzer test. (Doc. # 38, Ex. 1, pp. 113-14).[1] The arresting officer then ordered other officers to come get Mr. Murray, by yelling, "[C]ome get him out of my face." (Id., p. 117). Mr. Murray was next taken to the booking desk, where he inquired (by raised voice) about using the telephone. His request was denied (by an apparently louder voice) and the remainder of booking proceeded smoothly. (Id., pp. 117-20).

Mr. Murray was then escorted to a jail cell. Upon arriving at the cell, an officer directed Mr. Murray to enter. Mr. Murray responded, "You mean to tell me . . . .," but was pepper-sprayed and forced into the cell before he could finish the sentence. (Id., p. 120).[2] Mr. Murray contends that he had been completely compliant with the directions and commands of the officers up until the point he was pepper-sprayed. (Id., p. 122). Once inside the cell, he began yelling in pain and for assistance with his burning and swelling eyes. (Id., pp. 123-26). At this point, a decision was evidently made to further subdue Mr. Murray.

According to Mr. Murray, several of the defendants came to the cell and forcibly restrained him against the bars. (Id., pp. 126-28). They then pulled him out of the cell and proceeded to beat him. (Id., pp. 50-51, 130-32; see also id., Ex. 3, pp. 71-72; Doc. # 1, ¶¶ 14-15; Doc # 40, Ex. 1, pp. 66-67, 73-74). This beating occurred during the defendants' effort to put Mr. Murray into a straight jacket. The decision to place Mr. Murray into a

---

[1] Although the evidence is not entirely clear on this point, it appears that Mr. Murray registered a 0.09 blood alcohol content. (Doc. # 38, Ex. 1, p. 114).

[2] According to Mr. Murray, he intended to say, "You mean to tell me you ain't going to let me use the phone?" (Id., p. 120).

2

straight jacket apparently came at the hands of Deputy Simpson while Mr. Murray was still in the holding cell. (Doc. # 40, Ex. 11). According to Deputy Simpson, Mr. Murray remained very agitated after he was removed from his cell, swinging his fists, swinging his elbows, and cursing. (Doc. # 38, Ex. 9, pp. 84-86). The officers in direct proximity to Mr. Murray (according to Mr. Murray, and agreed upon by the defendants) were Deputy Holloway, and detention officers Ricky Pope, Rob Benyon, and Dameon Cox. (Doc. # 40, Ex. 12, p. 22; Ex. 13). Deputy Simpson never appears to have been in close proximity to Mr. Murray, being either at the booking desk, monitoring the situation from there, or actually in the process of retrieving the straight jacket used to restrain Mr. Murray. (*Id.*, Ex. 3, p. 95; *see also* Doc. # 38, Ex. 9, pp. 85-86, 87-93).

During the beating, Deputy Holloway struck Mr. Murray twice in the face.[3] Several individuals, including Deputy Holloway himself, admit that this use of force against Mr. Murray was either unnecessary or improper. (*Id.*, Ex. 13-15). Mr. Murray also claims, however, that Deputy Holloway pushed back on his nose, until it bled, and choked him in such a way as to endanger his life, all while he was straight-jacketed. (Doc # 40, Ex. 10, pp. 50-51, 95, 133-34). Although Deputy Simpson stated in his deposition that he did not recall seeing Deputy Holloway strike or choke the plaintiff (Doc. # 40, Ex. 3, p. 130), he does admit to monitoring the entire period during which Mr. Murray was restrained by

---

[3] The evidence is not clear as to how exactly Deputy Holloway struck Mr. Murray. Although Mr. Murray contends that he was struck in the face with what felt like a fist, Deputy Holloway contends that he "palmed" the plaintiff – that is, struck him with the flat, open part of his hand. (*Compare* Doc. # 38, Ex. 1, pp. 131-32 *with id.*, Ex. 3, pp. 71-72).

Deputy Holloway and the other detention officers. (Doc. # 38, Ex. 9, pp. 87-93; Doc. # 40, Ex. 11).

A few hours later, the straight-jacket was removed by one of the defendants. (Doc. # 1, ¶ 18). Mr. Murray eventually posted bond and was released from the Tuscaloosa County Jail. (*Id.*). As a result of the incident, Mr. Murray contends that he suffered pain and injury to his neck, face, eyes and nose, as well as the embarrassment of having to go to work with two black eyes. Moreover, the incident has affected his ability to sleep, and has caused or worsened his fear of police officers. (Doc. # 40. Ex. 10, pp. 42-48, 50-51, 55-57, 63-64, 68-70).

Mr. Murray initiated the above-styled action on December 29, 2000, alleging violations of both federal and state law. (Doc. # 1). On March 19, 2001, this court entered an order granting in part and denying in part a motion to dismiss of the defendants. (Doc. # 9-10). The court dismissed with prejudice all claims against Deputy Sheriff Ron Abernathy and Deputy Sheriff Kenny Shipman, as well as all claims against Sheriff Sexton, Chief Jailer Taggart, and deputies Holloway and Simpson in their official capacity.[4] The court also dismissed with prejudice Mr. Murray's claims for injunctive and/or declaratory relief.

The remaining claims on which the defendants seek summary judgment are: claims of excessive force against deputies Holloway and Simpson, under 42 U.S.C. § 1983; claims

---

[4] The court also dismissed a claim against Deputy Sheriff Robert Bynum in his official capacity, but allowed a claim to proceed against Deputy Bynum in his individual capacity. Based upon the filings of Mr. Murray and the evidentiary submissions of the parties, it appears that Deputy Bynum's is properly known as Deputy Robert Benyon. Nevertheless, neither man has been served or made an appearance in this action. Any claims then that remain pending against either Benyon or Bynum are accordingly dismissed for want of prosecution.

of failure to train or supervise against Sheriff Sexton and Chief Jailer Taggart, under 42 U.S.C. § 1983; claims of failure to enact and/or enforce policy against Sheriff Sexton and Chief Jailer Taggart, under 42 U.S.C. § 1983; and Alabama state law claims of assault and battery, intentional infliction of emotional distress, and negligence, against deputies Holloway and Simpson. The court will address each of these in turn. Additional facts are provided as they become necessary to the specific claims addressed.

### III.  Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotations omitted); *see also Crawford-El v. Britton*, 523 U.S. 574, 600 n.22 (1998). The movant can meet this burden by presenting evidence showing that there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. Once the moving party has met this burden, "the nonmoving party to go beyond the pleadings and by her own affidavits, or by

the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)).

The court must grant a motion for summary judgment if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249 (citations omitted); *accord Dzikowski v. NASD Regulation, Inc. (In re Scanlon)*, 239 F.3d 1195, 1198 (11th Cir. 2001); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). In rendering its decision, "[a] court 'must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'" *Hinson v. Clinch County Bd. of Educ.*, 231 F.3d 821, 826-27 (11th Cir. 2000) (quoting *Reeves*, 530 U.S. at 150).

### IV.     Discussion

#### A.     Claim of Excessive Force against Deputy Holloway

Section 1983 "is not itself a source of substantive rights, but merely . . . a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). To properly analyze a claim brought under § 1983, then, this court must first isolate

6

the right at issue, and determine if it has in fact been violated. *See id.* at 394, *see also Saucier v. Katz*, 121 S. Ct. 2151, 2156 (2001) ("This must be the initial inquiry."). The focus of the defendants' treatment of Mr. Murray's excessive force claims presumes the applicable constitutional protections as being those safeguarded by the Fourth Amendment to the United States Constitution. (Doc. # 37, 44).[5] Mr. Murray argues that the Due Process Clause of the Fourteenth Amendment[6] provides the rights and protections allegedly infringed in the instant case. The court agrees with Mr. Murray.

When an "excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right to be secure in their persons . . . against unreasonable . . . seizures of the person." *Graham*, 490 U.S. at 394.[7] When such a claim arises in the context of the pre-trial detention of an individual – as is the case with Mr. Murray's claim – it is most properly characterized as one invoking the protections of the Fourteenth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *see also Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989); *Johnson v. Breeden*, No. 00-14090, 2002 U.S. App. LEXIS 1115, at *27 (11th Cir. Jan. 28, 2002); *Lancaster v. Monroe County*, 116 F.3d 1419, 1425

---

[5] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const., amend. IV.

[6] ". . . nor shall any State deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const., amend. XIV, § 1.

[7] An example of such a claim – at least one capable of surviving summary judgment – can be found in the opinion also released by the court today, *Montgomery v. City of Birmingham, et al.*, CV-00-N-3160-S. In *Montgomery*, the plaintiff alleged that *during the course of an arrest*, police officers with the City of Birmingham forcibly removed him from a vehicle and threw him to the ground from a height of three feet, breaking his leg.

n.6 (11th Cir. 1997); *McMillian v. Johnson*, 88 F.3d 1554, 1564 (11th Cir. 1996).[8] Courts typically analyze Fourteenth Amendment claims under the rubric of substantive due process. *See County of Sacramento v. Lewis*, 523 U.S. 833, 843, 846-47 (1998); *see also Vaughan v. Cox*, 264 F.3d 1027, 1037 (11th Cir. 2001); *United States v. Myers*, 972 F.2d 1566, 1572 (11th Cir. 1992); *Jones v. City of Dothan*, 121 F.3d 1456, 1461 (11th Cir. 1997). Cases from this circuit, however, tend to apply the legal standards developed in connection with claims arising under the Eighth Amendment to claims alleging a violation of the Fourteenth Amendment. *See Johnson v. Breeden, supra*; *Marsh v. Butler County*, 268 F.3d 1014, 1024 n.5 (11th Cir. 2001) (en banc); *Taylor v. Adams*; 221 F.3d 1254, 1257 n.3 (11th Cir. 2000); *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996).[9] To properly analyze Mr. Murray's

---

[8] The Supreme Court has yet to determine whether the Fourth Amendment affords protections co-extensive to those afforded by the Fourteenth Amendment. *See Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 843-45 (1998). The Eighth Amendment does not afford such protections to individuals like Mr. Murray, whose guilt has not been adjudicated consistent with "the constitutional guarantees traditionally associated with criminal prosecutions." *See Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977); *see also Whitley v. Albers*, 475 U.S. 312, 327 (1986).

[9] The court pauses here to express some concerns about this apparent commingling of Eighth and Fourteenth Amendment analyses. In *County of Sacramento* the Supreme Court specifically articulated the necessity for a precise, amendment-based analysis in § 1983 actions. *See County of Sacramento*, 523 U.S. at 843 (". . . if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." (quoting *United States v. Lanier*, 520 U.S. 259, 272, n.7 (1997)). Demarcating the analytical approach by virtue of the amendment in play – especially when the Fourteenth Amendment is involved – guards against unwarranted expansion of the rather amorphous concept of substantive due process. *See County of Sacramento*, 523 U.S. at 842; *see also Neal v. Fulton County Bd. of Educ.*, 229 F.3d 1069, 1074 (11th Cir. 2000). Yet as the cases preceding this footnote demonstrate, Eighth Amendment analysis is typically (although not exclusively) applied to claims of excessive force under the Fourteenth Amendment, purging the analysis of any inquiry into whether the complained-of behavior shocks the conscience. *But see Vaughan v. Cox*, 264 F.3d 1027, 1037 (11th Cir. 2001); *United States v. Myers*, 972 F.2d 1566, 1572 (11th Cir. 1992). While this approach will not, in most cases, influence the outcome of the case, it does hamper the cases' ability to consider and define the scope of rights under the law held by a pre-trial detainee, as compared to an individual lawfully convicted. *See Graham*, 490 U.S. at 395 n.10; *Whitley v. Albers*, 475 U.S. at 327; *Bell v. Wolfish*, 441 U.S. at 537-40; *see also Johnson v. Breeden*, 2002 U.S. App. LEXIS 1115, at *27-*32; *cf. Oliver v. Falla*, 258 F.3d 1277, 1282 (11th Cir. 2001) (noting that proof of actual injury, whether compensable or not is required for excessive force cases under the Eighth Amendment).

The more acute problem presented by this commingling concerns the effect of two recent decisions of this circuit on the analysis this court should employ. In no uncertain terms, these two cases establish that the

claim then, this court must look at the case law developed in connection with excessive force claims under the Eighth Amendment as well as the Fourteenth Amendment. What this court must not do, however, is look to the case law developed in connection with excessive

---

"defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force maliciously and sadistically to cause harm is clearly established to be a violation of the Constitution by the Supreme Court...." *Skrtich v. Thornton*, No. 00-15959, 2002 U.S. App. LEXIS 1210, at * 8 (11th Cir. Jan. 29, 2002); *Johnson v. Breeden*, 2002 U.S. App. LEXIS 1115, at *32. Taking this rule and the tendency of this circuit to apply Eighth Amendment case law to Fourteenth Amendment claims, the court wonders whether the defense of qualified immunity should likewise be unavailable upon proof of a violation of Mr. Murray's Fourteenth Amendment rights. For the reasons set forth *infra*, however, the court declines to apply this rule to Mr. Murray's Fourteenth Amendment claims.

    First, the court notes that the holdings of *Skrtich* and *Breeden* appear in tension with both the Supreme Court's decision in *Saucier v. Katz* and the rationale of a recent en banc opinion of this circuit, *Marsh v. Butler County*. In *Saucier*, the Court emphasized that the inquiries of (1) whether conduct violates a constitutionally protected right; and (2) whether qualified immunity is warranted; are and should remain separate and distinct inquiries. *See Saucier*, 121 S. Ct. at 2155-56. In *Marsh*, this circuit in a footnote rejected as "incorrectly jumbl[ing] the merits of an Eighth Amendment violation with the separate concept of an immunity defense" a similar rule that had been articulated for Eighth Amendment deliberate indifference claims. *See Marsh*, 268 F.3d at 1038 n.8; *cf. Hill v. DeKalb Regional Youth Detention Ctr.*, 40 F.3d 1176, 1185-86 (11th Cir. 1994).

    The *Breeden* Court distinguished *Saucier*, noting that it dealt with a claim under the Fourth Amendment that did not involve a constitutional tort with a subjective intent element. *Breeden*, 2002 U.S. App. LEXIS 1115, at *31.

> It is different with claims arising from the infliction of excessive force on a prisoner in violation of the Eighth Amendment Cruel and Unusual Punishment Clause. In order to have a valid claim on the merits of excessive force in violation of that constitutional provision, the excessive force must have been sadistically and maliciously applied for the very purpose of causing harm. Equally important, it is clearly established that all infliction of excessive force on a prisoner sadistically and maliciously for the very purpose of causing harm and which does cause harm violates the Cruel and Unusual Punishment Clause. So, where this type of constitutional violation is established there is no room for qualified immunity. It is not just that this constitutional tort involves a subjective element, it is that the subjective element required to establish it is so extreme that *every conceivable set of circumstances* in which this constitutional violation occurs is clearly established to be a violation of the Constitution by the Supreme Court decisions in *Hudson* and *Whitley*.

*Breeden*, 2002 U.S. App. LEXIS 1115, at *31-*32 (quotations omitted) (emphasis added); *but see Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559-60 (11th Cir. 1993). This court likewise believes that *Marsh* can be distinguished, in light of differences in terms of quanta of proof necessary for success between deliberate indifference claims and excessive force claims. *See Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999) (quoting *Whitley*, 475 U.S. at 320-21); *see also Bass v. Perrin*, 170 F.3d 1312, 1317 n.5 (11th Cir. 1999).

    The court is reluctant to apply *Breeden* and *Skrtich* to Mr. Murray's case, however, because the basis for the decision in those cases is absent here. As *Breeden* makes plain, the holdings of *Hudson* and *Whitley* clearly establish what is a constitutional violation for purposes of the Eighth Amendment. The court would be extending *Hudson* and *Whitley* beyond their facts – and likely doing a disservice to the role qualified immunity plays in § 1983 cases – if it were to read them as clearly establishing the rule of law for Fourteenth Amendment cases as well. The court will continue to apply the Eighth Amendment cases to Mr. Murray's claim, as directed by the case law of this circuit. But this law does not, as the court understands it, likewise require an application of *Breeden* and *Sktrich* to his claims. Those cases are and remain strictly Eighth Amendment cases.

9

force claims under the Fourth Amendment. *See, e.g., Nolin v. Isbell*, 207 F.3d 1253, 1255-56 (11th Cir. 2000). The court now turns to this analysis.

The quantum of proof necessary to establish a constitutional violation based upon the application of excessive force is a high one:

> Under the Eighth Amendment, force is deemed legitimate in a custodial setting as long as it is applied "in a good faith effort to maintain or restore discipline [and not] maliciously and sadistically to cause harm." *Whitley v. Albers*, 475 U.S. 312, 320-21 [] (1986) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)); *see also Hudson v. McMillian*, 503 U.S. 1, 8 [] (1992). To determine if an application of force was applied maliciously and sadistically to cause harm, a variety of factors are considered including: "the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Hudson*, [*supra*] 7-8; *see also Whitley*, 475 U.S. at 321; *Harris v. Chapman*, 97 F.3d 499, 505 (11th Cir. 1996). From consideration of such factors, "inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley*, 475 U.S. at 321 (quoting *Johnson*, 481 F.2d at 1033).

*Sktrich*, 2002 U.S. App. LEXIS 1210, at *6-*7; *see also Campbell*, 169 F.3d at 1374 ("To establish an Eighth Amendment claim for excessive force, however, Plaintiff must . . . prove that 'force was applied ... maliciously and sadistically for the very purpose of causing harm.'" (quoting *Whitley*, 475 U.S. at 320-21 (quoting *Johnson v. Glick*, 481 F.2d at 1033))). The facts of the instant case – taken in a light most favorable to Mr. Murray – establish that Mr. Murray was (1) pepper-sprayed by his custodians for not immediately stepping into his cell; and (2) subsequently removed from his cell without receiving any aid whatsoever for his pepper-sprayed eyes and placed into a straight jacket. To facilitate the placement of Mr. Murray in the straight-jacked, Deputy Holloway apparently struck him twice in the head.

Moreover, Deputy Holloway appears to have choked Mr. Murray and pushed his nose up and back until it bled. These latter two actions occurred while Mr. Murray was straight-jacketed.

Based upon these facts, the court finds that a reasonable jury could conclude that Deputy Holloway acted maliciously and sadistically to cause harm, and not in a good faith effort to maintain or restore discipline, when subjecting Mr. Murray to the aforementioned force. In reaching this conclusion, the court is mindful of several facts: (1) Mr. Murray was in custody for driving under the influence; (2) the record is devoid of any evidence suggesting prior arrests and/or convictions of Mr. Murray that would justify a cause for caution and/or concern on the part of the officers; (3) Mr. Murray may have been verbally antagonistic toward the officers, but based upon the evidence presented at summary judgment, he was not physically antagonistic; (4) Mr. Murray remained under the effects of the pepper-spray when the officers put him in the straight jacked and subjected him to the force at issue in this action; and (5) Mr. Murray was in a straight jacket when Deputy Holloway allegedly choked him and caused his nose to bleed. These and other facts demonstrate a less-than-compelling need for force; an exhibition of force far greater than what appears to have been necessary; a less-than-obvious perceived threat by the officers; and little effort on the part of the officers to temper the forcefulness of the response. In other words, the facts as they are now before this court reasonably support a conclusion

that Deputy Holloway acted maliciously and sadistically with an intent to cause harm. If so, Deputy Holloway violated Mr. Murray's constitutionally protected rights.[10]

There of course remains the question of whether Deputy Holloway is entitled to qualified immunity. "A government-officer defendant is entitled to qualified immunity unless, at the time of the incident, the 'preexisting law dictates, that is, truly compels,' the conclusion for all reasonable, similarly situated public officials that what Defendant was doing violated Plaintiffs' federal rights in the circumstances." *Marsh*, 268 F.3d at 1030 (quoting *Lassiter v. Alabama A & M Univ., Bd. of Trustees*, 28 F.3d 1146, 1150 (11th Cir. 1994)). Applicable to the present case is the fact that Eleventh Circuit precedent by 1998 had "clearly established that government officials may not use gratuitous force against a prisoner who has been already subdued or . . . incapacitated." *Sktrich*, 2002 U.S. App. LEXIS 1210, at *14. The court believes a reasonable jury could readily conclude that the excessive force exercised against Mr. Murray was gratuitous, and that Mr. Murray was both incapacitated and subdued. Accordingly, the court finds that Deputy Holloway is not entitled to qualified immunity. Summary judgment on that claim is therefore denied.

---

[10] The court similarly finds that the facts are sufficient for a reasonably jury to conclude that Deputy Holloway's behavior shocks the conscience, to use the Fourteenth Amendment standard. The facts taken in a light most favorable to Mr. Murray are not entirely dissimilar from those presented by the famous case of *Rochin v. California*, where the defendant there had the contents of his stomach forcibly expunged by officers. *See Rochin v. California*, 342 U.S. 165, 166, 172-73 (1952). Here a man, restrained by straight jacket, pepper-sprayed, and twice-struck in the head with a stun-slap or a fist, was then choked and assaulted on the nose in a way as to cause it to bleed. A reasonable jury could readily find this behavior to shock the conscience, or violate the decency of civilized conduct. *Cf. County of Sacramento*, 523 U.S. at 846-47.

### B.    Claim of Nonfeasance against Deputy Simpson

Mr. Murray also claims that Deputy Simpson's failure to act in response to the constitutional violation occurring at the hands of Deputy Holloway constitutes actionable nonfeasance under § 1983.

> [A]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held personally liable for his nonfeasance. *See Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1560 (11th Cir.1993), as amended,14 F.3d 583 (11th Cir.1994) ("A police officer has a duty to intervene when another officer uses excessive force."); *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir.1986) ("if a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983"); *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1442 (11th Cir.1985) ("an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance"); *Harris v. Chanclor*, 537 F.2d 203, 206 n.6 (5th Cir.1976) ("a supervisory officer is liable under [Section] 1983 if he refuses to intervene where his subordinates are beating an inmate in his presence").

*Sktrich*, 2002 U.S. App. LEXIS 1210, at *7-*8. Presence at a scene, however, means more than mere happenstance proximity. An officer present at a scene, for purposes of § 1983 nonfeasance liability, is an officer who sees, expects, or has reason to expect the application of excessive force, and is in a position to intervene. *See Ensley v. Soper*, 142 F.3d 1402, 1407-08 (11th Cir. 1998); *Riley v. Newton*, 94 F.3d 632, 635 (11th Cir. 1996). The evidence is virtually undisputed as to Deputy Simpson's proximity to the events underlying this action. Questions exist, however, as to whether Deputy Simpson saw, expected, or had reason to expect what transpired, and whether he could have intervened. For example, Deputy Simpson contends that he did not see Deputy Holloway strike or choke Mr. Murray. Mr. Murray disputes this contention by citing to the transcript of a hearing involving Deputy

13

Simpson and Sheriff Sexton, where Deputy Simpson expresses an opinion regarding the use of force on Mr. Murray on the night in question. (Doc. # 41, Ex. 14, pp. 73-75). Through this record cite, Mr. Murray implies that Deputy Simpson did in fact see an application of excessive force by Deputy Holloway. (*Id.*, p. 25).

Based upon the evidence, the court believes that a reasonable jury could find Deputy Simpson liable for nonfeasance under § 1983. The critical evidence on this claim is the testimony of Deputy Simpson. If Deputy Simpson did not observe the application of excessive force and had no reason to expect its application, the claim against him should be dismissed. The record clearly establishes, however, that Deputy Simpson observed the entire period encompassing Mr. Murray's restraint.[11] During that time, Deputy Holloway undisputedly struck Mr. Murray twice on the head (how he struck him is in question). Deputy Simpson claims he did not see this. Yet Deputy Simpson also claims that Mr. Murray fought and struggled wildly during his removal from the cell and prior to being straight-jacketed. Mr. Murray disputes this fact, claiming he was physically complacent at all times. If a reasonable jury chooses to believe the testimony of Mr. Murray over Deputy Simpson, sufficient evidence exists to support a finding of nonfeasance liability against the deputy under § 1983.

Insofar as Deputy Simpson's eligibility for qualified immunity is concerned, the case law discussed *supra* – with respect to both nonfeasance liability and with respect to unconstitutional applications of excessive force – demonstrates the clear establishment of

---

[11] The record also clearly establishes that Deputy Simpson knew Mr. Murray had been pepper-sprayed, and that he authorized the use of and retrieved the straight jacket used to restrain Mr. Murray.

the rule that officers, present at a scene for purposes of § 1983 liability, have a duty to intervene. Deputy Simpson is therefore not entitled to qualified immunity.

### C. Claims against Sheriff Sexton and Chief Jailer Taggart

As the defendants properly observe in their reply submission to the court, Mr. Murray bases his claims that Sheriff Sexton and Chief Jailer Taggart failed to train and supervise on the ground that detention officers at the Tuscaloosa County Jail were not trained in "pressure point control tactics." (Doc. # 44, p. 6). In advancing this claim, Mr. Murray cobbles together allegedly supportive cases that touch all aspects of § 1983 law. While some of the cases cited are instructive and shed light on the viability of his claims, most are inapposite, as they fail to take into account a fact critical to the analysis necessary here: Sheriff Sexton and Chief Jailer Taggart are being sued in their individual capacities.

"Supervisor liability [under § 1983] occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." *Braddy v. Florida Dep't of Labor & Empl. Sec.*, 133 F.3d 797, 802 (11th Cir. 1998); *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990); *Fundiller v. Cooper City*, 777 F.2d 1436, 1443 (11th Cir. 1985); *see also Swint v. City of Wadley*, 51 F.3d 988, 999 (11th Cir. 1995); *Zatler v. Wainwright*, 802 F.2d 397, 402 (11th Cir. 1986). Neither the sheriff nor the jailer personally participated in the alleged violation of Mr. Murray's constitutional rights. Instead, the basis for the claims against them, as stated *supra*, arises from their apparent failure in training jail personnel, specifically in the area of pressure point control tactics. To establish a causal connection sufficient for purposes of § 1983 liability, Mr. Murray must show a "history of

widespread abuse [that] puts the responsible supervisor on notice of the need to correct the alleged deprivation, and [a failure by that official] to do so." *Braddy*, 133 F.3d at 802; *see also Brown v. Crawford*, 906 F.2d at 671; *Fundiller*, 777 F.2d at 1443. "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences." *Braddy*, *supra*; *see also Brown v. Crawford*, *supra*.

Mr. Murray has not come forward with evidence establishing or implying the existence of widespread abuse sufficient to place the sheriff or the chief jailer or notice of a need to correct ongoing constitutional deprivations. Indeed, the only evidence Mr. Murray has on this point is the hearsay statement of Deputy Simpson that the jail needed a wake-up call. (Doc. # 41, Ex. 19). This is not enough to establish a causal connection for purposes of § 1983 liability as to Sheriff Sexton or Chief Jailer Taggart in their individual capacities.

The argument that Tuscaloosa County jail officials should have been trained in pressure point control tactics appears to be advanced along an observation made by the Supreme Court in *City of Canton v. Harris*. There the Court observed:

> it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

*City of Canton v. Harris*, 489 U.S. 378, 390 (1989). Initially, the court notes that the liability issues presented by *Harris* do not arise here. The remaining claims against the sheriff and the chief jailer are claims against the men in their individual capacity. That being said, the

16

court does not understand the law as foreclosing individual liability against a person like the sheriff or the jailer for being deliberately indifferent to the training needs of their subordinates. The court does not, however, believe the instant facts present such a case.

Sheriff Sexton testified that as of January 1, 1999, the Tuscaloosa County jail was training new detention officers consistent with the minimum state standards for operating a jail. (Doc. # 38, Ex. 4, pp. 33-35). The sheriff also testified that prior to January 1, 1999, officers did receive training with respect to the use of force. (*Id.*, pp. 41-42; *see also id.*, Ex. 8). Although this training was apparently informal, and may have been given by various personnel in an on-the-job form, Mr. Murray fails to demonstrate how this training is so patently infirm in constitutional terms, or so otherwise places individuals like Sheriff Sexton or Chief Jailer Taggart on notice of its alleged patent constitutional infirmities, that Sheriff Sexton or Chief Jailer Taggart can be said to be deliberately indifferent to the needs of their charges.[12] Evidence that the jail needed a wake-up call, or that Chief Jailer Taggart thinks people need training in pressure point control tactics, does not *ipse dixit* render the existing policies unlawful. And they certainly do not provide a sufficient basis upon which a reasonable jury could found liability. Summary judgment is therefore due to be granted in favor of defendants Sexton and Taggart on the § 1983 claims asserted against them.

---

[12] Insofar as Mr. Murray argues in his responsive submission to the contrary, the court notes that some of the record cites proffered by him either (1) fail to support the proposition advanced; (2) fail to appear in the record at all (i.e., the evidence cited is not provided); or (3) concern specifically pressure point control tactics, as opposed to the more general training in use of force that took place at the county jail.

### D. State Law Claims against Deputy Holloway

The final claims pressed against Deputy Holloway are state law tort claims. With one minor exception (discussed *infra*), the defendants do not attack the actual claims asserted. Instead, they argue that the doctrine of discretionary function immunity precludes the viability of these claims. In light of the previous conclusions expressed *supra*, the court disagrees.

Discretionary function immunity "protects a State agent from liability for negligence or wantonness while performing discretionary functions." *Hinson v. Holt*, 776 So. 2d 804, 811 (Ala. Civ. App. 1998); *see also Moore v. Adams*, 754 So. 2d 630, 632 (Ala. 1999); Ala. Code § 6-5-338. Such immunity does not, however, extend to persons who act "'willfully, maliciously, fraudulently, or in bad faith.'" *Hison*, *supra* (quoting *Wright v. Wynn*, 682 So. 2d 1, 2 (Ala. 1996) (emphasis in original)); *see also Moore*, *supra*. This court has already found supra that a reasonable jury could conclude that Deputy Holloway acted maliciously and sadistically to cause harm to Mr. Murray, and not in a good faith effort to maintain or restore discipline. This court must therefore find Deputy Holloway ineligible for discretionary function immunity, with respect to the claims of assault and battery and negligence.

In their reply submission, the defendants for the first time raise the issue of whether Mr. Murray can prove as a matter of law the elements of his claim of intentional infliction of emotional distress. Although this court has the discretion to ignore this argument, in light of defendants' failure to raise it in their initial motion, the court will address it because it is not dispositive to Mr. Murray's claim.

18

> [W]illful wrongs, or those made so recklessly as to equate willfulness, authorize recovery in damages for the mental suffering caused thereby . . . . [O]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress. The emotional distress . . . must be so severe that no reasonable person could be expected to endure it. By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.

*Travelers Indem. Co. v. Griner*, No. 1981990, 2001 Ala. LEXIS 123, at *5-*6 (April 20, 2001) (quotations and citations omitted). In light of the facts, set out supra in a light most favorable to Mr. Murray, the court readily finds that a reasonable jury could conclude that the acts of Deputy Holloway "go beyond all possible bounds of decency" and qualify as "atrocious and utterly intolerable in a civilized society." Mr. Murray contends that Deputy Holloway choked him and assaulted his nose in such a way as to cause it to bleed, all while he was restrained in a straight jacket. A jury could easily find such behavior to warrant the imposition of liability. Summary judgment on this claim is therefore due to be denied as well.

### E.   State Law Claims against Deputy Simpson

For reasons similar to those discussed supra with respect to the nonfeasance claim alleged against Deputy Simpson, the court finds that summary judgment is due to be denied on the common law claim of nonfeasance as well. The defendants choose not to attack the underlying tort here, but simply rely upon the defense of discretionary function immunity. Considering the facts as alleged and in a light most favorable to Mr. Murray, however, the court believes that a reasonable jury could find that Deputy Simpson acted willfully,

maliciously, or in bad faith when he watched the events underlying this lawsuit unfold. Deputy Simpson cannot, therefore, claim discretionary function immunity.

### V. Conclusion

The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this _1st_ of April, 2002.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE